UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| FALCON PRODUCTS, INC., et al., | ) | Case No. 05-41108-399 |
| | ) | Jointly Administered Under Chapter 11 |
| Debtor. | ) | |
| | ) | |
| FALCON CREDITOR TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -v- | ) | Adv. No. 07-4032-399 |
| | ) | |
| FIRST INSURANCE FUNDING CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

The matter before the Court is the Complaint to Avoid and Recover Preferential Transfers filed by Plaintiff Falcon Creditor Trust ("Trust"). In the Complaint, the Trust seeks to avoid as preferential under Section 547 of the Bankruptcy Code certain pre-petition transfers from Falcon Products, Inc. ("Falcon") to Defendant First Insurance Funding Corporation ("First Insurance") in the aggregate amount of $297,136.17 and to recover such an amount from First Insurance pursuant to Section 550 of the Bankruptcy Code. The Trust also seeks the disallowance of any claim First Insurance has asserted against the Falcon bankruptcy estate[1] pursuant to Section 502(d) of the Bankruptcy Code. First

---

[1] The Falcon bankruptcy estate consists of the consolidated bankruptcy estates of Falcon and its affiliates Epic Furniture Group, Inc.; The Falcon Companies International, Inc.; Falcon Holdings, Inc.; Howe Furniture Corporation; Johnson Industries, Inc.; Madison Furniture Industries, Inc.; Sellers & Josephson, Inc.; and Shelby Williams Industries, Inc.

Insurance filed its Answer contesting the relief sought by the Trust and asserting various defenses under Section 547(c) of the Bankruptcy Code.

## Procedural History

This Court previously granted summary judgment in favor of First Insurance, determining that the Trust could not establish the fifth element of a preference: that the disputed transfers enabled First Insurance to receive more than it would receive if the Falcon case were a case under Chapter 7 of the Bankruptcy Code, if such transfers had not been made, and if First Funding received payment of such debt under the provisions of the Bankruptcy Code. 11 U.S.C. § 547(b)(5). [Order Granting Summary Judgment in Favor of Defendant First Insurance Funding Corporation, dated June 15, 2007, Docket Entry 22 ("Summary Judgment Order").] The Bankruptcy Appellate Panel of the Eighth Circuit reversed the Summary Judgment Order and remanded to this Court to consider any evidence in support of First Insurance's defenses under Section 547(c) of the Bankruptcy Code and to determine the actual effect of the transfers as directed by the Supreme Court in *Palmer Clay Products Co. v. Brown*, 297 U.S. 227 (1936). *Falcon Creditor Trust v. First Insurance Funding (In re Falcon Products, Inc.),* 381 B.R. 543, 549 (B.A.P. 8th Cir. 2008).[2]

In accordance with the instructions from the Bankruptcy Appellate Panel of the Eighth Circuit, this Court conducted a trial of the Complaint on January 27, 2009. The Trust and First Insurance were present through counsel. The Trust presented no evidence, instead relying on this Court's prior determination in the Summary Judgment Order that the

---

[2] First Insurance appealed the Bankruptcy Appellate Panel's decision to the Eighth Circuit Court of Appeals which dismissed the appeal as interlocutory. [Docket Entry 42, dated October 1, 2008.]

2

first four elements of a preferential transfer were not disputed and on the opinion of the Bankruptcy Appellate Panel of the Eighth Circuit to establish the fifth element. First Insurance presented evidence through witness Mark C. Lucas, Senior Vice President in charge of loan collections at First Funding, as well as the affidavit of Mr. Lucas previously submitted in support of First Funding's motion for summary judgment. [See Docket Entry 12, dated April 26, 2007.]

**Facts**

The facts are not in dispute. Some facts are set forth in the Summary Judgment Order and are incorporated herein by reference.[3] Additional facts are identified below. The legal conclusions that the Trust has established the first four elements of a preferential transfer are not in dispute. 11 U.S.C. § 547(b)(1)-(4). First Insurance continues to dispute the fifth element: that it received more than it would have received in a hypothetical Chapter 7 case. 11 U.S.C. § 547(b)(5). This Court agrees with First Insurance that as an over-secured creditor at the time each transfer was made it cannot have received more than it would have received in a hypothetical Chapter 7 case. It is "illogical" to find that a payment on a claim fully secured at the time of the transfer is preferential under Section 547(b) of the Bankruptcy Code. *Falcon Creditor Trust v. First Insurance Funding (In re Falcon Products, Inc.),* 381 B.R. 543, 548 (B.A.P. 8th Cir. 2008).

Furthermore, this Court believes that the *Palmer* decision upon which the Bankruptcy Appellate Panel relies is distinguishable from the present case. *Palmer* involved a different statute, Section 60a of the Bankruptcy Act, which required that: "the

---

[3] Certain facts from the Summary Judgment Order are restated herein to facilitate the flow of this opinion.

3

effect of such . . . transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class." *Palmer*, 297 U.S. at 228 n.2. The Supreme Court interpreted such language to require the calculation of the **actual** effect of the payment. The Supreme Court chose not to introduce an **impractical** rule which would require the court to answer a **hypothetical** question: "What would have been the financial result if the assets had then been liquidated and the proceeds distributed among the then creditors?" *Id.* at 299. In contrast, the preference statute in effect today expressly requires this Court to calculate a **hypothetical** result: What would have happened **if** the case were a case under Chapter 7, **if** the transfer had not been made, and **if** such creditor received payment of such debt to the extent provided by the provisions of the Bankruptcy Code? 11 U.S.C. § 547(b)(5). Accordingly, this Court does not believe the present statute requires the determination of the **actual** effect of a preferential transfer calculated as of the petition date. Rather, it requires this Court to conduct a **hypothetical** analysis. In so doing, this Court believes it is proper to consider what First Insurance would have done if Falcon had missed a payment. As set forth in the facts below, First Insurance would have cancelled the Policies and collected the full amount of its debt from the unearned premiums. Therefore, First Insurance did not receive more than it would have received in a hypothetical Chapter 7.

Nonetheless, this Court believes it is bound by the determination of the Bankruptcy Appellate Panel of the Eighth Circuit that it must conduct the hypothetical Chapter 7 liquidation test in this case **as of the date Falcon filed its bankruptcy petition**, assuming the December Payment and the January Payment were not made and yet taking into

4

account the fact that First Insurance did not cancel the Policies. Applying the calculation dictated by the Bankruptcy Appellate Panel, First Insurance received $38,062.10 more than it would have received in a hypothetical Chapter 7. [See Summary Judgment Order, p. 12, ¶ 19.] Accordingly, First Funding received a preferential transfer in accordance with Section 547 of the Bankruptcy Code in the amount of $38,062.10.

The analysis does not end here, however, because this Court must now consider First Insurance's defense under Section 547(c)(1) that the transfer cannot be avoided because it was intended by Falcon and First Insurance to be a contemporaneous exchange for new value given to Falcon and in fact was a substantially contemporaneous exchange. 11 U.S.C. § 547(c)(1).[4]

In addressing First Insurance's contemporaneous exchange for new value defense, the Court makes the following findings of fact, some of which are restated from and some of which are in addition to those contained in the Summary Judgment Order:

1. First Insurance is engaged in the business of financing commercial insurance premiums.

2. In November of 2004, Falcon Products, Inc. ("Falcon") entered into a commercial premium finance agreement ("Premium Finance Agreement") with First Insurance to finance multiple insurance policies (the "Policies").

3. The premiums for the Policies totaled $1,889,409.68.

4. Pursuant to the Premium Finance Agreement, Falcon agreed to pay a down payment of $472,584.85 toward the Policies' premiums (a 25% down

---

[4] First Insurance abandoned the other defenses asserted in its Answer.

5

payment) and First Insurance agreed to finance the premium balance of $1,416,824.83. Falcon agreed to repay the amount financed plus interest in ten monthly installments of $144,943.05 with the first installment due December 1, 2004.

5. Pursuant to the Premium Finance Agreement, Falcon granted First Insurance a security interest in return premiums, dividend payments, and certain loss payments with reference to the Policies. The Premium Finance Agreement additionally provided as follows:

> **Collateral.** To Secure payment of all amounts due under this agreement, [Falcon] grants [First Insurance] a security interest in the policies, including all return premiums, dividend payments, and loss payments which reduce unearned premiums, subject to any mortgagee or loss payee interest.

6. The Premium Finance Agreement also contained a power of attorney authorizing First Insurance to cancel the Policies if Falcon failed to make a payment when due or otherwise defaulted under the Premium Finance Agreement.

7. As a result of the foregoing, First Insurance held a security interest in all unearned premiums under the Policies. In the event Falcon failed to make a payment to First Insurance, First Insurance had the right to cancel the Policies and to apply the unearned premiums to the debt owed to it by Falcon under the Premium Finance Agreement.

8. Premiums were prepaid at the beginning of the Policies' terms through Falcon's down payment of $472,584.85 and thereafter earned under the Policies throughout the terms of the Policies. With respect to all but two of

6

the sixteen Policies, the premiums were earned on a daily basis at a rate of 1/365th of the prepaid premium. The other two Policies, each with a premium of $54,500 and taxes and fees of $1,745.62, had a minimum earned premium of twenty-five percent during the first quarter of the policy year.

9. The value of unearned premiums – which constituted First Insurance's collateral – diminished each day in an amount essentially equal to the difference between the total annual premiums under the Policies and the per diem amount of the premiums which became earned for each day that the insurance providers earned the premiums for providing insurance. The premiums under the Policies were earned at approximately $5,175.62 per day.

10. The Premium Finance Agreement was designed to ensure that the value of First Insurance's interest in the unearned premiums under the Policies always exceeded the balance owed to First Insurance by Falcon. Indeed, pursuant to the Premium Finance Agreement, in the event Falcon missed a payment, the value of the unearned premiums continued to exceed the debt due until between forty and forty-five days after Falcon missed a payment. Therefore, if Falcon missed a payment, First Insurance had at least forty days to enforce its interest in the unearned premiums and recover payment in full of all amounts due under the Premium Finance Agreement from the unearned premiums.

11. According to uncontroverted evidence, First Insurance follows a standard cancellation process in connection with its insurance premium finance

7

business. Seventeen days **before** a payment is due, First Insurance issues a billing statement. If a payment is missed on the due date and the principal amount of the missed payment exceeds $100,000, First Insurance makes a pre-cancellation call to the customer five days **after** the missed payment. Between ten and twelve days **after** a missed payment, First Insurance issues a notice of intent to cancel to the insured, the insurance agent, and the insurance company which issued the policy financed by First Insurance. If the payment remains unpaid, between ten and twelve days **after** issuance of the notice of intent to cancel, First Insurance issues a notice of cancellation of the financed policy to the insured, the insurance agent, and the insurance company. Pursuant to First Insurance's cancellation process, a policy is cancelled **within thirty days after** a missed payment.

12. First Insurance's cancellation process ensures that if Falcon had missed a payment under the Premium Finance Agreement, the financed Policies would have been cancelled within thirty days of the missed payment. The cancellation would have occurred well before forty to forty-five days after the missed payment when the value of the unearned premiums would have declined to a level insufficient to cover the unpaid balance due under the Premium Finance Agreement.

13. On December 6, 2004, First Insurance received the first monthly installment payment of $144,943.05 ("December Payment") due under the Premium Finance Agreement.

14. Immediately prior to the time the first payment was recorded on December 6, 2004, Falcon owed First Insurance $1,449,430.50 under the Premium Finance Agreement. As of that time, the unearned premiums under the Policies which constituted First Insurance's collateral had a value of $1,690,422.54. Therefore, the collateral value exceeded the debt by $240,992.04 at the time of the December Payment.

15. Upon receipt of the December Payment, Falcon's indebtedness to First Insurance was reduced by $144,943.05 and First Insurance's interest in the unearned premiums was likewise reduced by $144,943.05.

16. On January 10, 2005, First Insurance received the second monthly installment payment of $144,946.04 with a late charge payment of $7,247.08 for a total payment of $152,193.12 ("January Payment").

17. Immediately prior to the time the second payment was recorded on January 10, 2005, Falcon owed First Insurance $1,304,473.45 under the Premium Finance Agreement. As of that time, the unearned premiums under the Policies which constituted First Insurance's collateral had a value of $1,519,868.12. Therefore, the collateral value exceeded the debt by $215,394.67 at the time of the January Payment.

18. Upon receipt of the January Payment, Falcon's indebtedness to First Insurance was reduced by $152,193.12 and First Insurance's interest in the unearned premiums was likewise reduced by $152,193.12.

19. If Falcon had not made the December Payment or the January Payment, the value of the unearned premiums would have continued to exceed the balance due under the Premium Finance Agreement until January 22, 2005.

20. If Falcon had made the December Payment but had not made the January Payment, the value of the unearned premiums would have continued to exceed the balance due under the Premium Finance Agreement until February 20, 2005.

21. On the Falcon petition date of January 31, 2005, Falcon owed First Insurance $1,159,527.41 under the Premium Finance Agreement and the unearned premiums under the Policies had a value of $1,418,601.44. Therefore, the collateral value exceeded the debt by $259,074.03 on the petition date.

22. Falcon did not miss the December Payment or the January Payment under the Premium Finance Agreement. Therefore, First Insurance had no right to and, accordingly, did not cancel the Policies. Additionally, First Insurance was over-secured at the time of the December Payment, the January Payment, and the petition date.

The Court makes the following conclusions of law.

### Jurisdiction and Standing

1. This Court has jurisdiction over bankruptcy cases and over core proceedings arising under the Bankruptcy Code or arising in a bankruptcy case. 28 U.S.C. § 157(b) and Local Rule 9.01(B) of the United States District Court for the Eastern District of Missouri.

2. This action to recover an alleged preferential transfer is a core proceeding. 28 U.S.C. § 157(b)(2)(F).

3. Venue is proper. 28 U.S.C. § 1409(a).

4. The Trust has standing to prosecute this avoidance action.

### Preferential Transfer

5. Pursuant to Section 547(b) of the Bankruptcy Code, a transfer of an interest of the debtor in property may be avoided if the transfer was to or for the benefit of a creditor of the debtor; for or on account of an antecedent debt owed by the debtor before such transfer was made; made while the debtor was insolvent; made within ninety days before the date of the bankruptcy petition; that enabled the creditor to receive more than such creditor would receive if the case were a case under Chapter 7 of the Bankruptcy Code, if such transfer had not been made, and if such creditor received payment of such debt under the provisions of the Bankruptcy Code. 11 U.S.C. § 547(b).

6. The December Payment and the January Payment fall within the ambit of Section 547(b) of the Bankruptcy Code. The first four elements are undisputed and the fifth element has been established herein by the Bankruptcy Appellate Panel of the Eighth Circuit.

### Contemporaneous Exchange for New Value Defense

7. A transfer that is otherwise avoidable under Section 547(b) of the Bankruptcy Code as a preferential transfer may not be avoided if the transfer was intended by the debtor and the creditor to be a contemporaneous exchange

for new value given to the debtor and was in fact a substantially contemporaneous exchange. 11 U.S.C. § 547(c)(1).

8. The December Payment and the January Payment were **intended** by Falcon and First Insurance to be contemporaneous exchanges for new value given to Falcon. With respect to the December Payment, Falcon intended to transfer $144,943.05 to First Insurance and First Insurance intended to release the equivalent amount of its interest in the unearned premiums under the Policies. With respect to the January Payment, Falcon intended to transfer $152,193.12 to First Insurance and First Insurance intended to release the equivalent amount of its interest in the unearned premiums under the Policies. The Premium Finance Agreement was designed to operate this way and the parties' intent that it so operate can be inferred from its terms.

9. The December Payment and the January Payments were **in fact** contemporaneous exchanges for new value given to Falcon in the form of equivalent releases of collateral. Upon receipt of the December Payment, First Insurance's interest in the unearned premiums was reduced by $144,943.05. Upon receipt of the January Payment, First Insurance's interest in the unearned premiums was reduced by $152,193.12. Simply put, the "payment to the creditor results in a release of an equivalent value of collateral." *Falcon Creditor Trust v. First Insurance Funding (In re Falcon Products, Inc.),* 381 B.R. 543, 549 (B.A.P. 8th Cir. 2008).

10. The December Payment and the January Payment fall withing the ambit of Section 547(c)(1) of the Bankruptcy Code and, therefore, cannot be avoided as preferential transfers.

11. Since the December Payment and the January Payment cannot be avoided as preferential transfers, First Insurance can have no liability for an avoided transfer under Section 550 of the Bankruptcy Code. 11 U.S.C. § 550.

12. Furthermore, to the extent the Trust seeks the disallowance of a claim under Section 502(d) of the Bankruptcy Code, such relief is dependent on establishing liability for an avoided transfer under Section 550 of the Bankruptcy Code. Without liability on the part of First Insurance under Section 550 of the Bankruptcy Code, the Trust's request for claim disallowance must also fail. 11 U.S.C. §§ 502(d) and 550.

13. Accordingly, judgment shall enter in favor of Defendant First Insurance on all counts.

DATED: January 30, 2009
St. Louis, Missouri

_____
Barry S. Schermer
Chief United States Bankruptcy Judge

Copies to:

David Michael Brown
Spencer Fane Britt & Browne LLP
1 N Brentwood Blvd, 10th Fl
St. Louis, MO 63105

David A. Sosne
Summers, Compton et al.
8909 Ladue Rd.
St. Louis, MO 63124